1

2

3

4

5

6

7

8                    **IN THE UNITED STATES DISTRICT COURT**

9                    **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11  GLORITA ALIYU,                              CASE NO. CV-F-04-5552 LJO

12              Plaintiff,                      **DECISION ON SOCIAL SECURITY**
                                                **COMPLAINT**
13      vs.                                     (Docs. 16, 21.)

14  JO ANNE B. BARNHART,
    Commissioner of Social
15  Security,

16              Defendant.
                                         /
17

18                            **INTRODUCTION**

19          Plaintiff Glorita Aliyu ("plaintiff") seeks this Court's review of an administrative law judge's

20  ("ALJ's") decision that plaintiff is not disabled and is ineligible for disability insurance benefits and

21  Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act ("Act"), 42

22  U.S.C. §§ 401-433 and 1381-1381d.  Pursuant to 28 U.S.C. § 636(c) and F.R.Civ.P. 73, the parties

23  agreed to proceed before a United States Magistrate Judge, and by a September 21, 2004 order, this

24  action was assigned to United States Magistrate Judge Lawrence J. O'Neill for all proceedings.  Based

25  on review of the Administrative Record ("AR") and the papers of plaintiff and defendant Jo Anne B.

26  Barnhart, Commissioner of Social Security ("Commissioner"), this Court DENIES plaintiff's request

27  to reverse the Commissioner's decision to deny plaintiff disability insurance benefits and SSI or to

28  remand for further proceedings.

                                             1

**BACKGROUND**

**Plaintiff's Personal Background**

Plaintiff is age 50 and has a high school education and past relevant work as an insurance claims examiner. (AR 17, 24, 85, 386, 388, 413.) Plaintiff is married and lives with her husband and teenage son. (AR 387.)

**Administrative Proceedings**

***Plaintiff's Prior Application for Disability Insurance Benefits***

On April 29, 1996, plaintiff protectively filed her prior application for disability insurance benefits (not at issue here). (AR 15.) The Social Security Administration ("SSA") denied plaintiff's application initially on May 16, 1996 and on reconsideration on August 2, 1996. (AR 15.) After a November 16, 2000 hearing, the ALJ issued her December 13, 2000 decision to find plaintiff ineligible for disability insurance benefits. (AR 15, 411.) Plaintiff submitted her Request for Review of Hearing/Decision to SSA's Appeals Council, which on July 23, 2001, denied plaintiff's request. (AR 15.) Plaintiff did not file an action to seek judicial review to render res judicata the ALJ's decision that plaintiff was not disabled prior to December 13, 2000. (AR 15.)

***Plaintiff's Current SSI Application***

On March 14, 2001, plaintiff protectively filed her SSI application at issue here to claim disability since December 14, 2000. (AR 58.) In her March 14, 2001 Disability Report Adult, plaintiff claimed she became unable to work on January 11, 1994 due to depression, anxiety, high blood pressure, neck and back problems, asthma, and angina. (AR 78, 81.) With its May 23, 2001 Notice of Disapproved Claims, SSA denied plaintiff's claim and determined plaintiff condition is not severe enough to prevent her to work. (AR 29.)

On July 2, 2001, counsel was appointed for plaintiff. (AR 42.) On July 9, 2001, plaintiff filed her Request for Reconsideration to claim her condition prevents her to engage in substantial gainful activity. (AR 33.) With its September 26, 2001 Notice of Reconsideration, SSA again denied plaintiff's claim and determined plaintiff's condition is not severe enough to prevent her to work. (AR 35.)

On October 18, 2001, plaintiff filed her Request for Hearing by Administrative Law Judge to claim her condition prevents her to engage in substantial gainful employment. (AR 39.) On May 22,

2002, plaintiff's current counsel was appointed. (AR 48.) After a September 10, 2002 hearing, the ALJ issued his April 24, 2003 decision to conclude that plaintiff has the residual functional capacity to perform a significant range of light work and is not disabled. (AR 26.)

Plaintiff submitted to the Appeals Council her April 30, 2003 Request for Review of Hearing Decision to seek review of the ALJ's decision. (AR 10.) With its November 3, 2003 letter, the Appeals Council granted plaintiff a 30-day extension to submit additional evidence. (AR 8.) On February 12, 2004, the Appeals Council denied plaintiff's request to review the ALJ's April 24, 2003 decision to render it as the Commissioner's final determination subject to this Court's review.[1] (AR 5.)

## Medical History And Records Review

### *David S. Kerwin, M.D., Treating Physician*

Plaintiff started to treat with David S. Kerwin, M.D. ("Dr. Kerwin"), on October 3, 1997 when she presented with problems of high blood pressure, neck and low back pain, and hypothryroidism. (AR 347, 349.) Plaintiff reported no trauma to her low back and that one doctor "told her that the pain was all in her head." (AR 349.) Dr. Kerwin assessed hypertension, apparently well controlled, low back and neck pain with history of scoliosis, mild obesity and history of low thyroid, controlled. (AR 348.)

On May 20, 1998, plaintiff complained of off and on chest pain and chronic neck pain. (AR 346.) On June 2, 1998, Dr. Kerwin noted plaintiff's hypertension, hyperthyroid obesity, non-specific chest pain, and acute depression. (AR 345.) On June 19, 1998, Dr. Kerwin referred plaintiff for an echocardiogram. (AR 344.) On July 2, 1998, plaintiff complained her back went out and of chronic back and neck pain. (AR 431.) Dr. Kerwin assessed headache, degenerative disc disease ("DJD"), cervical neck pain and depression. (AR 341.) On August 13, 1998, plaintiff complained of chronic back and neck pain, chronic leg cramps, and sharp wrist pain. (AR 339.) Dr. Kerwin assessed increased blood pressure, poor control, and DJD. (AR 339.) On August 17, 1998, plaintiff complained of abdominal pain. (AR 338.) Dr. Kerwin assessed headache and hypertension. (AR 338.) On November

---

[1] The Commissioner notes that plaintiff had filed an application for disability insurance benefits which was barred by res judicata in that plaintiff's insured status expired on March 31, 1999 and the December 13, 2000 ALJ decision on plaintiff's prior application found plaintiff not disabled through December 13, 2000. Although the record lacks plaintiff's current application for disability insurance benefits, the ALJ specifically found that plaintiff is not entitled to a period of disability and disability insurance benefits. (AR 16.)

4, 1998, plaintiff complained of increased blood pressure and neck, back and bilateral knee pain.  (AR 335.)  Dr. Kerwin assessed neck muscle pain.  (AR 335.)  On December 15, 1998, plaintiff complained of chest pain and fatigue for the past week.  (AR 333.)  Dr. Kerwin assessed hypertension.  (AR 333.)

On January 29, 1999, plaintiff complained of high blood pressure and stomach pain.  (AR 332.) On February 10, 1999, plaintiff complained of chronic high blood pressure and chest pain, numbness to her arms for two months, and wrist pain for the past week.  (AR 328.)  On March 11, 1999, plaintiff complained of high blood pressure, cold chills, fatigue and inability to stay awake.  (AR 326.)  Dr. Kerwin diagnosed mononucleosis, chronic fatigue and hypertension.  (AR 326.)  On April 1999, plaintiff complained of depression, chronic pain and heartburn.  (AR 324.)  Dr. Kerwin diagnosed hypertension, depression and Gastroesophagal Reflux Disease ("GERD").  (AR 324.)  On June 4, 1999, plaintiff complained of GERD, neck pain and high blood pressure, of which notes reflect "borderline control." (AR 323.)  Dr. Kerwin assessed GERD and blood pressure.  (AR 323.)  July 2, 1999 radiological imaging of plaintiff's cervical spine revealed normal height and density of cervical vertebral bodies, no evidence for a compression fracture or bone destruction, reversal of normal lordotic curvature to represent mild interval improvement, and unchanged mild C5-6 degenerative disk disease.  (AR 321.) On September 29, 1999, plaintiff complained of stomach aches, GERD and chest pain/heartburn.  (AR 320.)  Dr. Kerwin assessed GERD, depression and hypertension.  (AR 320.)  On November 22, 1999, plaintiff complained of chest pain.  (AR 319.)  December 10, 1999 notes reflect plaintiff's hypertension is under good control with Lotrel and Dr. Kerwin's diagnosis of depression and neck and back pain. (AR 316.)

On March 20, 2000, plaintiff complained of depression and hearing voices.  (AR 312.)  Plaintiff was assessed with depression/panic attacks, allergic rhinitis and hypertension.  (AR 312.)  On April 24, 2000, plaintiff complained of moderate to severe depression and constant chest pain.  (AR 315.) Plaintiff was assessed with depression, hay fever and cough, rule out asthma.  (AR 313, 315.)  April 25, 2000 chest x-rays were "stable" with no evidence of acute pleural or parenchymal disease.  (AR 310.) On May 1, 2000, plaintiff was assessed with asthma, right wrist pain and chronic low back pain.  (AR 308, 309.)  May 11, 2000 wrist x-rays identified "[n]o significant abnormality." (AR 307.)  On June 14,

2000, plaintiff was assessed with right wrist ganglion, hypertension and angina. (AR 306.) On August 28, 2000, plaintiff was assessed with angina (worse), asthma, anxiety/panic disorder, hypertension and chronic cough. (AR 305.) On October 11, 2000, plaintiff was assessed with asthma, hypertension, rhinitis, chronic neck pain and hypothyroid. (AR 304.) October 24, 2000 chest x-rays revealed no significant degenerative change of the thoracic spine, no acute disease, and residua of old granulomatous disease. (AR 302.) On November 1, 2000, plaintiff was assessed with asthma, hypertension, anemia, hypothyroid, and depression. (AR 301.) November 3, 2000 notes reflect plaintiff's "ok" blood pressure. (AR 297.)

Dr. Kerwin prepared a November 3, 2000 history and examination report to note that plaintiff was "in to get some disability advocates forms filled out." Dr. Kerwin explained that plaintiff's "main problem with disability is depression and panic attacks. She's completely unable to deal with the public and rarely gets out of the house. . . . The panic attacks occur with varying frequency from every day to only one or two a month . . ." Dr. Kerwin graded as "very poor" plaintiff's ability to follow work rules, relate to coworkers, deal with the public, use judgment, interact with supervisors, deal with work stressors, function independently, and maintain attention and concentration. (AR 298.) Dr. Kerwin noted that plaintiff "would be hard pressed to understand, remember[] and carry out simple job instructions let alone anything more complex." (AR 298.)

With regards to plaintiff's physical problems, Dr. Kerwin noted plaintiff's severe low back pain, neck pain and generalized joint pains. (AR 298-299.) Dr. Kerwin concluded that plaintiff "could probably" for less than an hour walk, stand and sit. (AR 299.) According to Dr. Kerwin, plaintiff could lift/carry less than five pounds occasionally. (AR 299.) Dr. Kerwin assessed that plaintiff is unable to perform "a full range of sedentary work mostly because of the emotional problem, although she can't do much in the way of sitting or standing either." Dr. Kerwin concluded that plaintiff could not work an eight-hour day five days a week and experienced moderate to severe low back pain. (AR 299.) Dr. Kerwin noted he did not expect "any real improvement." (AR 299.)

On January 22, 2001, plaintiff was assessed with hypertension, anemia, hypothyroid, depression and menorrhagia. (AR 296.) On February 26, 2001, plaintiff was assessed with hypertension (uncontrolled), chest pain and anemia. (AR 291.) On March 7, 2001, plaintiff was assessed with

hypertension (uncontrolled), pharyngitis and asthma.  (AR 290.)  On March 21, 2001, plaintiff was assessed with hypertension, asthma and anxiety/depression.  (AR 286.)  An April 10, 2001 treadmill test revealed plaintiff's good exercise endurance, 85 percent of predicted heart rate achieved, and no exercise induced chest pain.  (AR 283.)  On April 18, 2001, plaintiff was assessed with hypertension, depression, hyperlepedenea and asthma.  (AR 282.)  On July 9, 2001, plaintiff was assessed with poorly controlled hypertension.  (AR 281.)  On July 26, 2001, plaintiff was assessed with asthma and blood pressure.  (AR 278.)  On August 24, 2001, plaintiff was assessed with asthma and blood pressure.  (AR 277.) September 26, 2001 notes reflect plaintiff's borderline blood pressure.  (AR 276.)  On October 2 and 26, 2001, plaintiff was assessed with hypertension, asthma and hyperlipedemia.  (AR 270, 271.)  On November 9, 2001, plaintiff complained of pain piercing like needles in her calf without spasm.  (AR 269.)  December 13, 2001 notes reflect plaintiff's "very good" asthma for the past three weeks.  (AR 268.)

On January 17, 2002, plaintiff was assessed with depression/panic, DJD, and high blood pressure.  (AR 267.)  Dr. Kerwin completed a January 17, 2002 Complete Medical Report (Physical) to note clinical findings of tender paraspinal neck and spasm, a diagnosis of DJD, treatment with Tylenol and NSAID, fair response to treatment and prognosis, and inability to do heavy lifting and walk, sit or stand "very long."  (AR 202.)  Dr. Kerwin concluded plaintiff is able to: (1)lift/carry  up to 20 pounds occasionally; (2) sit fours in an eight-hour workday for up to two hours without interruption; (3) stand/walk up to two hours in an eight-hour workday for up to two hours without interruption; (4) use her hands and feet without limitation; (5) frequently balance, reach, handle, feel, push/pull, hear and speak.  (AR 203-205.)  Dr. Kerwin concluded that plaintiff is unable to climb, stoop, crouch, kneel or crawl and should avoid all exposure to noise.  (AR 205.)

Dr. Kerwin completed a January 17, 2002 Complete Medical Report (Mental) to note clinical findings of "depressed – panic," a diagnosis of depression and anxiety from pain, treatment of Prozac and Trazadone, and fair response to treatment and diagnosis. (AR 208.) Dr. Kerwin concluded plaintiff has fair ability to follow work rules, use judgment, understand, remember and carry out simple job instructions, behave emotionally stable, relate predictably and demonstrate reliability, and poor ability to relate to coworkers, deal with public, interact with supervisors, deal with stress, function

1   independently, maintain attention/concentration, and understand, remember and carry out complex or

2   detailed job instructions.  (AR 209-211.)

3        On April 10, 2002, plaintiff was assessed with tonsilitis.  (AR 357.)  On May 22, 2002, plaintiff

4   was assessed with hypertension and neck pain.  (AR 359.)

5        Dr. Kerwin completed a July 9, 2002 Complete Medical Report (Physical) to note his treatment

6   of plaintiff for high blood pressure, depression and angina and plaintiff's fair response to treatment and

7   prognosis.  (AR 351.)  Dr. Kerwin found that plaintiff is able to: (1) lift/carry up to 10 pounds; (2) sit

8   or stand/walk two hours in an eight-hour workday up to 30 minutes at a time; (3) lie/elevate three hours

9   in and eight-hour workday up to one hour at a time; and (4) occasionally reach, handle, feel, push/pull,

10  hear and speak.  (AR 353-354.)  Dr. Kerwin restricted plaintiff to climb, balance, stoop, crouch, kneel,

11  and crawl.  (AR 354.)

12                          ***Stanislaus County Department Of Mental Health***

13       Plaintiff received treatment from the Stanislaus County Department of Mental Health.  During

14  November 1999 to May 17, 2000, plaintiff was treated with Prozac, Trilofon 4 mg, Trazadone 50 mg,

15  and Perphenazine 2 mg.  (AR 261, 263.)  On April 20 and 27, 2000, plaintiff participated in anxiety

16  group meetings.  (AR 240.)  May 17, 2000 notes reflect no side effects from medications, continuing

17  anxiety/panic attacks, cessation of hearing voices, and fair judgment and insight.  (AR 239-240.)

18  Plaintiff participated in anxiety group meetings on May 25, 2000, June 1, 22 and 29, 2000, and July 20

19  and 27, 2005.  (AR 233, 234, 238.) At an August 10, 2000 anxiety group meeting, plaintiff complained

20  that she was fatigued.  (AR 231.)  At a September 7, 2000 anxiety group meeting, plaintiff stated she

21  experienced physical pain and related depression.  (AR 231.)  At a September 14, 2000 anxiety group

22  meeting, plaintiff stated that she experienced increased sleep disturbance, and a counselor discussed the

23  effect of mixing alcohol and drugs with plaintiff's medications.  (AR 231-232.)  At a September 28,

24  2000 anxiety group meeting, plaintiff stated that she was "extremely depressed," withdrawn, helpless

25  and tearful, lacked energy, experienced increased sleep disturbance, and had no suicide plan. (AR 232.)

26  At an October 5, 2000 anxiety group meeting, plaintiff reported "feeling better not helpless." (AR 228.)

27  October 10, 2000 notes reflect plaintiff was "feeling better . . . less nervous." (AR 218, 258.) November

28  9, 2000 notes reflect that a request for progress notes was forwarded for an "S.S.I. court hearing." (AR

229.)  On December 11, 2000, plaintiff described herself as stable and noted that auditory hallucinations

(noises) were helped by medication.  (AR 219, 257.)  On December 28, 2000, plaintiff told her counselor

that plaintiff believes her anxiety "is brought on by her depression."  (AR 225, 255.)

During February 2001 to April 2001, plaintiff was maintained on Prozac 20 mg, Trazadone 50

mg, and Perphenazine 2 mg.  (AR 253, 375.)  February 13, 2001 physician notes state:

> [P]atient is intelligent [and] articulate and presents her [history and medication] regimen
> well.  Basically, she has a 5 year [history] of depressive episodes, sometimes with
> psychotic ideation.  Presently, she is taking Prozac 20 mg/day, Trazadone 50 mg/day,
> [and] Perphenazine 4 mg/day, and is doing well.  When seen today she is attractively
> dressed [and] groomed – clear thinking – no psychotic ideation – euthymic with pleasant
> calm, friendly, good-natured attitude.  (AR 221, 252.)

The physician continued plaintiff's medications.  (AR 221, 252.)

On April 9, 2001, plaintiff reported she was "in much better shape" but felt "tired all the time."

(AR 252, 375.)  Plaintiff denied hearing voices but noted that she experienced panic attacks and felt as

if "somebody is after me."  (AR 252, 375.)  Progress notes reflect that plaintiff is anxious and fearful

and sleeps okay.  (AR 251.)  Plaintiff was assessed with schizo-affective disorder, rule out bipolar

disorder, and continued on her medications.  (AR 251.)  On June 8, 2001, plaintiff noted her decreased

energy, inability to be around people, and a few panic attacks.  (AR 251, 374.)  Plaintiff was assessed

with schizo-affective disorder and continued on her medications.  (AR 251.)  A July 11, 2001 intake

form noted plaintiff's goal to "eventually go back to work."  (AR 383.)  July 31, 2001 notes reflect that

plaintiff was to attend a mental health treatment group twice a week, a depression treatment group once

a week, and a trauma recovery group once a week.  (AR 376.)  Plaintiff participated in July 24 and 31,

2001, August 2, 7, 9, 16, 21, 23, 27 and 30, 2001, and September 6, 13, 25 and 27, 2001 mental health

treatment group meetings.  (AR 370-373, 376, 377.)

On July 8, 2002, plaintiff was assessed with major depressive disorder, recurrent, severe without

psychotic features.  (AR 360, 378.)  A treatment summary note reflects that plaintiff completed the first

of three phases of mental treatment groups but stopped attending without "good cause."  (AR 360, 378.)

July 8, 2002 notes further reflect that several attempts were made to re-engage plaintiff into treatment

and that her case was closed in the absence of plaintiff's attempt to seek treatment.  (AR 365.)

/ / /

### *Ralph H. Wood, M.D., Consultative Internist*

Ralph H. Wood, M.D. ("Dr. Wood"), a board certified internist, conducted a consultative examination and prepared an April 23, 2001 report. (AR 241.) Plaintiff's chief complaints were depression, hypertension and back pain. (AR 241.) Plaintiff noted that she stopped working in 1994 as an insurance claims examiner because of mental problems and was diagnosed in 1995 with major depression with anxiety attacks. (AR 241.) Dr. Wood's mental examination was generally normal. (AR 241.) Dr. Wood's examination of plaintiff's back and extremities revealed no atrophy or pedal edema with full range of motion in all four extremities. (AR 242.) Dr. Wood diagnosed essential hypertension, exogenous obesity, chronic depression, history of hypercholerolemia and atypical chest pain at rest. (AR 242.) Dr. Wood concluded:

> The claimant is not using an ambulatory assistance device and none is medically indicated. I would think the claimant could stand for 1 ½ hours without a break. I find no limitations in sitting. I would think she could walk several blocks. I feel that she should be able to lift, push or pull up to 30 pounds. I find no limitations in hand movements nor is there any restriction in fine finger movements. (AR 242.)

### *Gregory Fields, Ph. D., Consultative Psychologist*

Gregory Fields, Ph.D. ("Dr. Fields"), conducted a May 3, 2001 consultative examination. (AR 243.) Plaintiff's chief complaints were major depression, panic attacks, chronic back and neck pain, high blood pressure, hypercholerolemia and angina. (AR 243.) Plaintiff noted that although she had attended outpatient anxiety group sessions for six months, she had not been involved with the group for five or six months. (AR 243.) Plaintiff reported the onset of a possible auditory hallucination a couple of years ago. (AR 243.) As to plaintiff's current level of functioning, Dr. Fields noted plaintiff lives with her son in an apartment, takes the bus, shops for groceries, prepares meals, does laundry and housework, prepares her son for school, intermittently sleeps and cleans throughout the day, visits with a couple of friends, reads the Bible, listens to the radio, and is "independent in basic activities of daily living." (AR 245.) Dr. Fields noted plaintiff's euthymic affect and fair insight and judgment with evidence of neither formal thought disorder nor delusional thought processes. (AR 245.) Dr. Fields diagnosed panic disorder without agoraphobia and major depressive disorder, recurrent, mild to moderate. (AR 245.) Dr. Fields found plaintiff's prognosis fair and concluded:

> The claimant's ability to deal with the public, supervisors and co-workers appears to be

mild to moderately limited.

The claimant's ability to maintain attention and concentration for simple one and two step tasks appears to be unimpaired. Her ability to perform multiple step and higher level cognitive tasks appears to be grossly unimpaired from a cognitive point of view based on brief mental status testing.

The claimant's ability to withstand the stress and pressure associated with the interview and mental status testing was essentially unimpaired based upon today's performance. (AR 246.)

### *Physical Residual Functional Capacity Assessment*

George A. Jansen, Sr., M.D. ("Dr. Jansen"), completed a May 4, 2001 Physical Residual Functional Capacity Assessment to conclude that plaintiff is able to: (1) lift/carry 30 pounds occasionally and 10 pounds frequently; (2) stand and/or walk about six hours in an eight-hour workday; (3) sit about six hours in an eight-hour workday; (4) push/pull subject to the lift/carry limitations; (5) occasionally climb ramps and stairs, stoop, kneel, crouch and crawl; and (6) frequently balance. (AR 159.) Dr. Jansen found neither manipulative, visual, communicative nor environmental limitations. (AR 161-162.) Dr. Jansen concluded that plaintiff is unable to climb ladders, ropes and scaffolds. (AR 159.) Dr. Jansen noted that plaintiff's treating physician "provides an MSS of less than sedentary, but documentation discovered lacks evidentiary foundation for this MSS." (AR 163.)

### *Mental Residual Functional Capacity Assessment*

Charlotte Bible, M.D. ("Dr. Bible"), completed a May 22, 2001 Mental Residual Functional Capacity Assessment to conclude generally that plaintiff is not significantly limited in understanding and memory, sustained concentration and persistence, social interaction, and adaptation. (AR 165-166.) Dr. Bible completed a Psychiatric Review Technique to note plaintiff's depressive syndrome, mild restriction of daily living activities, moderate difficulties in maintaining social functioning and no difficulties in maintaining concentration, persistence or pace. (AR 178, 183.)

S. Yancha, M.D. ("Dr. Yancha"), completed a September 14, 2001 Mental Residual Functional Capacity Assessment and reached the same general conclusions as Dr. Bible. (AR 169-170.) Dr. Yancha completed a September 14, 2001 Psychiatric Review Technique to note that a medically determinable impairment is present that does not satisfy diagnostic criteria for affective disorders. (AR 190.) Dr. Yancha found moderate restriction and difficulties in plaintiff's daily living activities,

1  maintaining social functioning, and maintaining concentration, persistence or pace.  (AR 197.)

2  *Medications*

3  Plaintiff's medications have included Tiazac 300 mg, Trazodone 50 mg, Micardis 40 mg,

4  Perphenazine 2 mg and 4 mg, Prozac 20 mg and 40 mg, Micardis 40 mg, Hydrochlorothiazide 25 mg,

5  Penicillin, Lescol, Ferrous, Cyclobenzaprine 10 mg, Albuterol, Tiazac, Prevacid 30 mg, Nitrostat,

6  Acetaminophen with Codeine, Promethazine 50 mg, Diflunisal 500 mg, Lipitor 10 mg, Albuterol

7  inhaler, Ibuprofen 600 mg, Flexeril 10 mg, Nitroguick, and Flexeril 10 mg.  (AR 84, 86, 123, 131, 135,

8  139.)

9  **Plaintiff's Activities And Testimony**

10  *Reports And Questionnaires*

11  In her March 14, 2001 Disability Report Adult, plaintiff claimed her ability to work is limited

12  by constant drowsiness from medications, neck and back pain and chronic high blood pressure.  (AR 79.)

13  Plaintiff stopped working as an insurance claims examiner on January 11, 1994 "because I got fired

14  because I had bizzare (sic) behavior because of my depression."  (AR 79.)

15  In a March 21, 2001 Exertional Daily Activities Questionnaire, plaintiff noted that on an average

16  day she sleeps, worries, takes pills, performs light housekeeping and prays.  (AR 117.)  Plaintiff's

17  medication causes difficulty "to function at any level."  (AR 117.)  Plaintiff grocery shops once a month

18  with a friend who drives her and helps her.  (AR 117.)  Plaintiff is able to walk 15 minutes before she

19  needs to rest, and her back is painful.  (AR 118.)  Plaintiff lacks interest in a social life.  (AR 118.)

20  Plaintiff is unable "to focus on any task for long period of time" and is "very forgetful."  (AR 118.)

21  Plaintiff completed a March 21, 2001 Daily Activities Questionnaire to note that on an average

22  day, she gets her son off to school, takes medication, sleeps "a little," straightens the house "throughout

23  the day," and cooks.  (AR 119.)  Plaintiff experiences insomnia and nightmares to require her to take

24  Trazadone 50 mg.  (AR 119.)  Plaintiff and her son prepare meals.  (AR 120.)  Plaintiff grocery shops,

25  and her son helps select food and his clothes.  (AR 120.)  Plaintiff is able to dust, place clothes in the

26  washer and dryer and place dishes in dish washer.  (AR 120.)  Plaintiff leaves her home only when

27  needed for doctors' appointments, shopping, paying bills, and attending her son's school meetings.  (AR

28  121.)  Plaintiff rides a bus.  (AR 121.)  Plaintiff cares for her son.  (AR 122.)  Plaintiff is unable to

"stand large crowds" and does not enjoy "simple shopping." (AR 122.) Plaintiff is forgetful and forgets what she is talking about or where she placed things. (AR 123.) Household chores require her all day to complete. (AR 123.) Plaintiff is unable to work because of "severe uncontrolled high blood pressure, depression and panic attacks, difficulty breathing and severe heart pain, sleepy, tired and drowsy, unable to deal with people." (AR 123.) Plaintiff lost her job "due to stress" and does not remember the "event that lead to firing." (AR 123.)

Plaintiff completed a July 21, 2001 Reconsideration Disability Report to claim increasing chest pains and blood pressure, fatigue, limited daily activities, rest periods to complete household chores, dislike of large crowds, inability to handle pressure and perform heavy lifting, forgetfulness, constant neck and back pain, dizziness and drowsiness from medication, and improvement when left alone and lying down. (AR 88.) Plaintiff's condition causes her to spend more time to clean, to limit household activities, to experience increased fatigue, inability to bend and focus, and inability to sit or stand long periods of time. (AR 90.)

In a March 23, 2001 Work History Report, plaintiff noted she worked as an insurance claims examiner during 1977-1994. (AR 101.) In an October 18, 2001 statement, plaintiff claimed her "blood pressure is more uncontrollable." (AR 98.)

In a June 10, 2002 statement, plaintiff indicated that she feels very fearful and edgy and experiences increased heart pain, blood pressure, panic attacks and difficulty to function. (AR 137.) Plaintiff does not remember what her doctors have told her about her condition although she sees them once a month. (AR 137.) Plaintiff's medications cause drowsiness, sleepiness, fatigue and chest tightness. (AR 138.)

Plaintiff's son completed a March 21, 2001 Daily Activities Questionnaire (Third Party Information) to note that on a typical day, plaintiff makes sure her son is ready for school, cleans a little and sleeps. (AR 125.) Plaintiff sleeps too much and has nightmares. (AR 126.) Plaintiff requires all day to clean and has "hard time grooming herself." (AR 126.) Plaintiff prepares meals, and sometimes her son helps. (AR 126.) Plaintiff and her son shop together. (AR 126.) Plaintiff handles finances, laundry, dishes, sweeping and dusting. (AR 127.) Her son assists to the clean the bathroom and to vacuum. (AR 127.) Plaintiff uses public transportation. (AR 127.) Plaintiff does not go anywhere

except for business and doctors' appointments.  (AR 129.)  Plaintiff misplaces things and forgets "a lot."  (AR 129.)  Plaintiff tires easily and screams in her sleep.  (AR 129.)

### *Plaintiff's Testimony At November 16, 2000 ALJ Hearing*

In connection with her prior disability insurance claim, plaintiff testified at a November 16, 2000 ALJ hearing that she believes her disability started in January 1995 and that she has neither worked nor applied for jobs since then.  (AR 414-415.)  Plaintiff claims that around January 1995, she became "very chronically fatigued," "was crying a lot," and "experienced a panic attack" to cause her to "finally" see a doctor.  (AR 415.)  Plaintiff was told she had chronic fatigue and a thyroid problem.  (AR 415.)

Plaintiff's work as an insurance claims examiner and customer service representative required her to sit most of the time and to deal directly with people.  (AR 416.)

Plaintiff awakes between 6 a.m. and 10 a.m.  (AR 417.)  Plaintiff is able to dress and bathe herself and complete some household chores "with rest."  (AR 418.)  Plaintiff cooks, washes dishes, mops, vacuums, does laundry, grocery shops and collects recipes from magazines.  (AR 419.)  Plaintiff generally spends her time "[s]leeping, resting in bed."  (AR 422.)  Plaintiff stays in her room because she dislikes dealing with people.  (AR 422.)  Plaintiff is home "basically . . . all the time."  (AR 422.)

Plaintiff does not have a driver's license because she has not been driving for years.  (AR 419.)  Plaintiff occasionally attends church.  (AR 419.)  Plaintiff takes her son to the park for an hour or so and visited his teachers to address problems with his disability.  (AR 420, 421.)

Plaintiff experiences problems sitting from neck and back pain and is able to sit for an hour.  (AR 422.)  Plaintiff estimates she is able to lift 20-30 pounds.  (AR 422.)

With her panic attacks, plaintiff experiences "hot flashes," breathing difficulty and fear.  (AR 422.)  Her longest panic attack was "[a]t least a day or so."  (AR 422.)

Plaintiff experiences dizziness from her high blood pressure but has never kept track of the frequency of dizziness.  (AR 423.)  Plaintiff sometimes checks her blood pressure at a drug store.  (AR 423.)

Plaintiff takes sleep medication and has no problems sleeping.  (AR 420.)  Plaintiff experiences drowsiness and "maybe dragging off" from medications.  (AR 421.)

/ / /

1

***Plaintiff's Testimony At September 10, 2002 ALJ Hearing***

2     Plaintiff testified at the September 10, 2002 ALJ hearing that plaintiff does not have a driver's

3   license because she does not have a car. (AR 387.) Plaintiff last worked in 1994 and was fired after she

4   "lost control in the office." (AR 387-388.) Plaintiff characterizes that she lost "emotional" control. (AR

5   388.) Plaintiff completed and passed medical assistant classes after she graduated from high school.

6   (AR 388.) She received a certificate in 1997. (AR 388.)

7     Plaintiff does not believe she is able to return to full-time work, including her past work, because

8   she is "sick all the time," has "concentration problems," and experiences dizziness, sudden panic attacks

9   and memory lapses. (AR 389.) Symptoms of plaintiff's panic attacks include heart racing and pain,

10  tense muscles and nausea. (AR 389.) Plaintiff experiences panic attacks at least twice a day and lasting

11  from 10 minutes to an entire day. (AR 389.) Plaintiff's panic attacks worsen if she is around people.

12  (AR 390.) Plaintiff would have panic attacks if she worked at night as a janitor when people were not

13  around because she experiences panic attacks "all of a sudden" even if people are not around and at

14  night. (AR 390.) During panic attacks, plaintiff tries to breath, control herself and practice breathing

15  exercises. (AR 391.)

16    Plaintiff's mind drifts when she reads or watches television. (AR 390.) Plaintiff estimates that

17  she can focus for 30 minutes. (AR 390.) Plaintiff forgets where she places papers or things for

18  safekeeping and to turn off the stove. (AR 390.)

19    Plaintiff experiences constant piercing back pain. (AR 394.) Plaintiff is able to be on her feet

20  for up to an hour at which time she needs to sit down. (AR 394.) Plaintiff is able to sit for an hour at

21  one time. (AR 394.) Sitting is easier than standing for plaintiff. (AR 395.) Plaintiff lies down two to

22  three hours per day to "take breaks" from her neck and back pain. (AR 395.) Dr. Kerwin did not say

23  anything to plaintiff about lying down. (AR 396.) Plaintiff estimates she is able to lift five or ten

24  pounds. (AR 396.)

25    Plaintiff gets "heart pains all the time" for which she takes Nitrostet for relief. (AR 396.)

26  Plaintiff clarified she experiences heart pain three or four times a day. (AR 396.) An inhaler helps

27  plaintiff's breathing problems. (AR 397.) Plaintiff is unable to identify things that aggravate her

28  breathing problems although she guesses "pollen and stuff in the air" contribute to breathing problems

1    when she is outdoors in the spring.  (AR 397, 398.)

2         Plaintiff has high blood pressure which causes dizziness three or four times a week for five

3    minutes at a time.  (AR 399.)  For the dizziness, plaintiff sits or lies down.  (AR 399.)

4         At the time of hearing, plaintiff was 5-foot-7 and weighed 231 pounds.  (AR 398.)  Plaintiff

5    attributes a more than 75-pound weight gain during 1995-2000 to a thyroid problem.  (AR 399, 400.)

6         Plaintiff came to the hearing with a cane because she fractured her fibula in two places in June

7    prior to the hearing when she fell.  (AR 392-393.)  Dr. Kerwin told plaintiff to use the cane.  (AR 395.)

8         Plaintiff attributes "dry mouth" to her medications.  (AR 399.)  Plaintiff does not know if

9    medications cause her to tire but she gets "tired easily."  (AR 399.)  When plaintiff is fatigued, she sits

10   or lies down.  (AR 400.)

11         On a normal day, plaintiff gets up, takes a shower, fixes something to eat, does light house

12   cleaning, rests and watches a little television.  (AR 397.)  Plaintiff dresses and bathes without assistance.

13   (AR 397.)  Plaintiff has no problems to prepare meals.  (AR 397.)  Plaintiff's husband helps with house

14   cleaning but plaintiff can manage it if necessary.  (AR 397.)  Plaintiff claims she is unable to perform

15   house cleaning as an occupation because "[t]here's a lot of bending and stooping and I have to take lots

16   of breaks."  (AR 398.)

17         For enjoyment, plaintiff goes to movies once every three or four months.  (AR 398.)  Plaintiff

18   grocery shops and goes to doctor's appointments.  (AR 398.)

19        ***Testimony of Vocational Expert Stephen Schmidt***

20         Vocational expert Stephen Schmidt ("Mr. Schmidt") testified at the September 10, 2002 ALJ

21   hearing that plaintiff's past insurance claims work was sedentary.  (AR 400.)  As a first hypothetical, the

22   ALJ asked Mr. Schmidt to assume a person who is able to: (1) stand for one to one and a half hours

23   without a break; (2) sit without limitation; (3) walk several blocks; and (4) lift, push or pull up to 30

24   pounds.  (AR 401.)  Mr. Schmidt opined such person would be able to perform plaintiff's past relevant

25   work.  (AR 401.)

26         As a second hypothetical, the ALJ asked Mr. Schmidt to assume a person who is: (1) able to lift

27   30 pounds occasionally and 10 pounds frequently; (2) able to sit, stand and/or walk for about six hours

28   with normal breaks; (3) unable to climb ladders, ropes and scaffolds; and (4) able to climb stairs, stoop,

1  kneel, crouch and crawl occasionally.  (AR 401.)  Mr. Schmidt opined such person  would be able to

2  perform plaintiff's past relevant work.  (AR 402.)

3      As a third hypothetical, the ALJ asked Mr. Schmidt to assume a person who: (1) is able to

4  lift/carry up to 20 pounds occasionally; (2) is able to sit four hours and up to two hours without

5  interruption; (3) is able to stand or walk two hours without interruption; (4) is unable to climb, stoop,

6  crouch, kneel or crawl; (5) must avoid moderate exposure to humidity and dust; and (6) must avoid

7  concentrated exposure to temperatures.  (AR 402.)  Mr. Schmidt opined that such person is unable to

8  perform plaintiff's past work or other work.  (AR 403.)

9      As a fourth hypothetical, the ALJ asked Mr. Schmidt to assume a person who: (1) has moderately

10  limited ability to deal with public supervisors and coworkers; (2) unimpaired ability to maintain

11  concentration for simple one- and two-step tasks; (3) grossly impaired ability to perform multiple step

12  higher-level cognitive tasks; and (4) normal ability to withstand stress and pressure of an interview and

13  mental status testing.  (AR 403, 404.)  Mr. Schmidt opined such person is able to perform unskilled

14  work.  (AR 404.)

15      Mr. Schmidt opined that unskilled work subject to the first and second hypotheticals would be

16  sedentary and identified assembly positions (10,000 jobs in California and 3,300 in the region) and hand

17  packers (6,000 jobs in California and 2,000 in the region).  (AR 404-405.)

18      As a hypothetical, plaintiff's counsel asked Mr. Schmidt to assume as a hypothetical person in

19  an assembly or hand packer position with recurrent severe panic attacks manifested by sudden,

20  unpredictable onset of intense apprehension, fear, terror and sense of impending doom on the average

21  of no less than once per week and requiring an hour of rest to lie or sit down away from people.  (AR

22  406-407.)  Mr. Schmidt opined that anyone who is unable to follow a competitive 40-hour per week

23  schedule is not employable and "that would not fall within that framework."  (AR 407.)

24                          **The ALJ's Findings**

25      In his April 24, 2003 decision, the ALJ identified the specific issue as whether plaintiff is under

26  a disability, which is defined as the inability to engage in substantial gainful activity by reason of any

27  medically determinable physical or mental impairment that is expected to result in death or that has

28  lasted or can be expected to last for a continuous period of no less than 12 months at any time since

                                          16

March 14, 2001. (AR 17.)  In concluding plaintiff is capable to adjust to work that exists in significant numbers in the national economy and is ineligible for disability insurance benefits and SSI, the ALJ found:

1.     Plaintiff has an impairment or combination of impairments considered "severe" but which do not meet or medically equal an impairment in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listing of Impairments").

2.     Plaintiff's allegations regarding her limitations are not totally credible.

3.     Plaintiff retains the residual functional capacity for no more than that the full range of unskilled, light exertional work, reduced by environmental limitations that preclude working around dust, smoke, irritants or other noxious fumes.

4.     Plaintiff is unable to perform her past relevant work.

5.     Plaintiff has transferable skills from previous semi-skilled work.

6.     Plaintiff has the residual functional capacity to perform a significant range of light work.

7.     Although plaintiff's exertional limitations prevent her to perform the full range of light work, based on Mr. Schmidt's testimony and using Rule 202.21 of the Medical-Vocational Guidelines, 20 C.F.R., Part 404, Subpart P, Appendix 2, there are a significant number of jobs in the national economy that plaintiff could perform, including 10,000 assembly and 6,000 hand packaging jobs at an unskilled, light exertional level and with 3,300 and 2,000 jobs respectively in the region.  (AR 24, 25-26.)

## DISCUSSION

### Standard of Review

Congress has provided limited judicial review of a Commissioner's decision made through an ALJ. *See* 42 U.S.C. § 405(g).  A court must uphold the Commissioner's decision, made through an ALJ, when the determination is not based on legal error and is supported by substantial evidence.  *See Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985); *Sanchez v. Secretary of Health & Human Services*, 812 F.2d 509, 510 (9th Cir. 1987) (two consulting physicians found applicant could perform light work

contrary to treating physician's findings).[2]  Substantial evidence is "more than a mere scintilla," *Richardson v. Perales*, 402 U.S. 389, 402, 91 S.Ct. 1420 (1971), but less than a preponderance, *Sorenson v. Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975).  Substantial evidence "means such evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401, 91 S.Ct. 1420; *Sandgathe*, 108 F.3d at 980.

The record as a whole must be considered, weighing both the evidence that supports and detracts from the Commissioner's conclusion.  *Sandgathe*, 108 F.3d at 980; *Jones,* 760 F.2d at 995.  If there is substantial evidence to support the administrative finding, or if there is conflicting evidence that will support a finding of either disability or nondisability, the finding of the Commissioner is conclusive. *Sprague v. Bowen*, 812 F.2d 1226, 1229-1230 (9th Cir. 1987).  If the evidence is susceptible to more than one rational interpretation, the court may not substitute its judgment for that of the Commissioner. *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999); *Morgan v. Commissioner*, 169 F.3d 595, 599 (9th Cir. 1999).

This Court reviews the ALJ's decision pursuant to 42 U.S.C. § 405(g) to determine whether it is: (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a whole.  *Copeland v. Bowen*, 861 F.2d 536, 538 (9th Cir. 1988).  "A decision of the ALJ will not be reversed for errors that are harmless."  *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

Plaintiff bears the burden to prove that she is disabled which requires presentation of "complete and detailed objective medical reports of her condition from licensed medical professionals." *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999) (citing 20 C.F.R. §§ 404.1512(a)-(b), 404.1513(d)). Plaintiff must furnish medical and other evidence about plaintiff's medical impairments.  20 C.F.R. §§ 404.1512(a), 416.912(a); ("[Y]ou must bring to our attention everything that shows that you are blind or disabled."); 20 C.F.R. §§ 404.1514, 416.914 ("We need specific medical evidence to determine whether you are disabled or blind.  You are responsible for providing that evidence.")

Here, plaintiff claims disability since January 11, 1994 due to depression, anxiety, high blood

---

[2]    "The district court properly affirms the Commissioner's decision denying benefits if it is supported by substantial evidence and based on the application of correct legal standards." *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997).

1  pressure, neck and back problems, asthma and angina.  (AR 78, 81.)  As discussed below, this Court

2  finds that the ALJ properly evaluated the evidence and that his conclusion that plaintiff is not disabled

3  is based on proper legal standards and substantial evidence.

4  <u>**Evaluation Of Plaintiff's Mental Impairments**</u>

5  Plaintiff criticizes the ALJ's evaluation of plaintiff's mental impairments.  Initially, plaintiff

6  claims the ALJ erred in finding plaintiff's impairments did not meet or equal Listing 12.04 (Affective

7  Disorders) or 12.06 (Anxiety Related Disorders) of the Listing of Impairments.  The Commissioner

8  responds that plaintiff did not meet the requirements of a particular Listing and fails to identify a Listing

9  which she met or equaled.

10  The SSA regulations provide: "If you do not have any impairment or combination of impairments

11  which significantly limits your physical or mental ability to do basic work activities, we will find that

12  you do not have a severe impairment and are, therefore, not disabled."  20 C.F.R. §§ 404.1520(c),

13  416.920(c).  "Basic work activities" are the "abilities and aptitudes necessary to do most jobs," including

14  "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling" as well as

15  "[u]nderstanding, carrying out, and remembering simple instructions."  20 C.F.R. §§ 404.1521(b)(1),

16  (3), 416.921(b)(1), (3).  At step two of the five-step disability analysis, "the ALJ must consider the

17  combined effect of all of the claimant's impairments on her ability to function, and without regard to

18  whether each alone was sufficiently severe."  *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996).

19  Such inquiry "is a de minimis screening device to dispose of groundless claims."  *Smolen*, 80 F.3d at

20  1290 (citing *Bowen v. Yuckert*, 482 U.S. 137, 153-154, 107 S.Ct. 2287, 2297-2298 (1987)).

21  The purpose of the Listing of Impairments is to describe impairments "severe enough to prevent

22  a person from doing any gainful activity."  *Sullivan v. Zebley*, 493 U.S. 521, 532, 110 S.Ct. 885 (quoting

23  Social Security Ruling (SSR) 83-19, Dept. of Health and Human Services Rulings 90 (Jan. 1983)).  If

24  a claimant meets or equals a listed impairment, he/she is disabled.  *Tackett*, 180 F.3d at 1099.

25  The United States Supreme Court has explained application of the Listings of Impairments:

26  The listings . . . are descriptions of various physical and mental illnesses and
   abnormalities, most of which are categorized by the body system they affect.  Each
27  impairment is defined in terms of several specific medical signs, symptoms, or laboratory
   test results.  For a claimant to show that his impairment matches a listing, it must meet
28  *all* of the specified medical criteria.  An impairment that manifests only some of those

criteria, no matter how severely, does not qualify. . . . "The level of severity in any particular listing section is depicted by the *given set* of findings and not by the degree of severity of any single medical finding – no matter to what extent that finding may exceed the listed value."

. . .

The [Commissioner] explicitly has set the medical criteria defining the listed impairments at a higher level of severity than the statutory standard. The listings define impairments that would prevent an adult, regardless of his age, education, or work experience, from performing *any* gainful activity, not just "substantial gainful activity."

*Sullivan v. Zebley*, 493 U.S. 521, 530-531, 110 S.Ct. 885 (1990) (italics in original; citations omitted).

"While the Listing of Impairments does describe conditions that are generally considered severe enough to prevent a person from doing any gainful activity, an ALJ should not consider a claimant's 'impairment to be one listed in Appendix 1 solely because it has the diagnosis of a listed impairment. It must also have the **findings** shown in the Listing of that impairment.'" *Young v. Sullivan*, 911 F.2d 180, 184 (9th Cir. 1990) (quoting 20 C.F.R. § 404.1525(d); *Key v. Heckler*, 754 F.2d 1545, 1549-1550 (9th Cir. 1985)) (bold added).

To "meet" a listed impairment, a claimant must establish that he or she meets each characteristic of a listed impairment relevant to his/her claim. *Tackett*, 180 F.3d at 1099. To "equal" a listed impairment, a claimant must establish symptoms, signs and laboratory findings at least equal in severity and duration to the characteristics of a relevant listed impairment. *Tackett*, 180 F.3d at 1099. Medical equivalence must be based on medical findings in the evidence supported by medically acceptable clinical and laboratory diagnostic techniques. *Tackett*, 180 F.3d at 1100; 20 C.F.R. §§ 404.1526(b) and 416.926(b).

The ALJ explained his rationale that plaintiff's impairments did not meet or equal a Listing of Impairments:

Because the claimant suffers from a severe mental condition, the undersigned has carefully considered whether her condition meets or equals the requisite criteria found in any of the section 12.00 listings by using the "technique" as outlined in the provisions of 20 CFR § 404.1520a. In this case, the record specifically reveals that the claimant has been diagnosed with major depressive syndrome and panic disorder that have been associated with depressive signs of anhedonia, feelings of worthlessness and hopelessness, disturbed sleep, concentration loss and feelings of anxiety with recurrent anxiety attacks. Because such symptoms fall within the criteria of both an affective and anxiety related disorder, it is necessary to evaluate the claimant's degrees of limitation utilizing the "B" and "C" criteria of section 12.04 in order to determine whether her mental condition meets or equals either listing. Despite the severity of her symptoms, however, the undersigned has determined that she only has at most mild restrictions in

her activities of daily living, moderate difficulties in maintaining social functioning, and mild deficiencies of concentration, persistence, or pace.  Furthermore, there is no evidence that the claimant has ever experienced repeated episodes of decompensation of extended duration, and such repeated episodes would not be expected to occur even with a minimal increase in mental demands or change in environment.  There is also no evidence that she has been or would be unable to function outside of a highly supportive living arrangement.  Accordingly, this undersigned finds that the claimant's mental condition, although severe, does not meet or equal the 12.04 or the 12.06 listing.  (AR 18.)

Thereafter, the ALJ detailed plaintiff's mental health treatment, claims and testimony to support his finding.  (AR 19-20.)

Plaintiff points to no concrete error in the ALJ's comprehensive evaluation of her mental impairments.  Without meaningful argument or analysis, plaintiff criticizes the ALJ's reliance on Dr. Fields' assessment.  Dr. Fields diagnosed panic disorder without agoraphobia and major depressive disorder, recurrent, mild to moderate.  (AR 245.)  Dr. Fields found mildly to moderately impaired plaintiff's ability to deal with the public, supervisors and coworkers.  (AR 246.)  Dr. Fields found unimpaired plaintiff's ability to maintain attention and concentration for simple one- and two-step tasks and multiple step and higher level cognitive tasks.  (AR 246.)  As noted by the Commissioner, the findings of Dr. Fields, a consultative psychologist, "can amount to substantial evidence, so long as other evidence in the record supports those findings."  *Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996), *cert. denied*, 519 U.S. 113 (1997).  Dr. Field's assessment is consistent with plaintiff's treatment at Stanislaus County Department of Mental Health, where she was treated with medication and attended numerous anxiety and depression group meetings.  On October 5, 2000, plaintiff reported "feeling better not helpless."  (AR 228.)  On December 11, 2000, plaintiff described herself as stable and noted that auditory hallucinations were improved with medication.  (AR 219, 257.)  On April 9, 2001, plaintiff reported she was "in much better shape," denied hearing voices and slept okay.  (AR 251, 252, 375.)  On July 11, 2001, plaintiff noted her goal to return to work.  (AR 383.)

Plaintiff fails to substantiate her claim of further development of the record in light of the existing, extensive record.  "An ALJ's duty to develop the record further is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." *Mayes v. Massanari*, 276 F.3d 453, 459-460 (9th Cir. 2001).  Such is not the case here.

1       **New Evidence**

2       _____Plaintiff requests remand to consider new evidence which she cites but has failed to provide to

3       this Court.  The additional medical records identified by plaintiff are dated after the ALJ's April 24,

4       2003 decision.  A remand is appropriate under 42 U.S.C. § 405(g) "where the new evidence is material

5       and there is good cause for the failure to incorporate such evidence in the record in a prior proceeding."

6       *Booz v. Secretary of Health and Human Services*, 734 F.2d 1378, 1380 (9th Cir. 1984); *Burton v.*

7       *Heckler*, 724 F.2d 1415, 1417 (9th Cir. 1984).  In 1980, Congress amended 42 U.S.C. § 405(g) to add

8       a materiality requirement "at least in part to limit the court's ability to remand cases for consideration

9       of new evidence."  *Ward v. Schweiker*, 686 F.2d 762, 764 (9th Cir. 1982) (citing *Carter v. Schweiker*,

10      649 F.2d 937, 942 (2nd Cir. 1981)).

11      "To meet the materiality requirement, the new evidence offered must bear directly and

12      substantially on the matter in dispute."  *Burton*, 724 F.2d at 1417.  "[E]vidence is sufficiently material

13      to require a remand, 'only where there is a *reasonable possibility* that the new evidence would have

14      changed the outcome of the [Commissioner's] determination had it been before him.'"  *Booz*, 734 F.2d

15      at 1380 (quoting and adopting *Dorsey v. Heckler*, 702 F.2d 597, 604-605 (5th Cir. 1983) (italics in

16      original).  "The good cause requirement often is liberally applied where . . . there is no indication that

17      a remand for consideration of new evidence will result in prejudice to the [Commissioner]."  *Burton*,

18      724 F.2d at 1417-1418.

19      In addition to not providing the new evidence, plaintiff fails to explain how it is material.  This

20      Court is not in a position to speculate as to the materiality of the new evidence.  If the evidence indicates

21      deterioration after the hearing, it would be material to a new application and not probative of plaintiff's

22      condition at the time of the September 10, 2002 hearing.  *See Sanchez*, 812 F.2d at 512.

23      **Credibility Evaluation**

24      Plaintiff criticizes the ALJ's evaluation of plaintiff's credibility.  The Commissioner contends

25      that the ALJ considered plaintiff's subjective complaints and gave specific reasons to reject plaintiff's

26      testimony.

27      "Credibility determinations are the province of the ALJ."  *Fair v. Bowen*, 885 F.2d 597, 604 (9th

28      Cir. 1989); *Russell v. Bowen*, 856 F.2d 81, 83 (9th Cir. 1988).  "An ALJ cannot be required to believe

1    every allegation of disabling pain." *Fair*, 885 F.2d at 603. An ALJ "may disregard unsupported, self-

2    serving statements." *Flaten v. Secretary of Health & Human Services*, 44 F.3d 1453, 1464 (9th Cir.

3    1995). "If the ALJ finds that the claimant's testimony as to the severity of her pain and impairments is

4    unreliable, the ALJ must make a credibility determination with findings sufficiently specific to permit

5    the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." *Thomas v.*

6    *Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002). If an ALJ's credibility finding is supported by substantial

7    evidence in the record, a reviewing court may not engage in second-guessing. *Thomas*, 278 F.3d at 959.

8    A reviewing court will not reverse an ALJ's credibility determinations "based on contradictory or

9    ambiguous evidence." *Johnson v. Shalala*, 60 F.3d 1428, 1434 (9th Cir. 1995) (citing *Allen v. Heckler*,

10   749 F.2d 577, 579 (9th Cir. 1984)). "So long as the adjudicator makes specific findings that are

11   supported by the record, the adjudicator may discredit the claimant's allegations based on inconsistencies

12   in the testimony or on relevant character evidence." *Bunnell v. Sullivan*, 947 F.2d 341, 346 (9th Cir.

13   1991).

14           In *Light v. Social Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997), the Ninth Circuit commented:

15           In weighing a claimant's credibility, the ALJ may consider his reputation for truthfulness,
             inconsistencies either in his testimony or between his testimony and his conduct, his
16           daily activities, his work record, and testimony from physicians and third parties
             concerning the nature, severity, and effect of the symptoms of which he complains.
17           *Smolen*, 80 F.3d at 1284; *Moncada v. Chater*, 60 F.3d 521, 524 (9th Cir. 1995) (quoting
             *Orteza v. Shalala*, 50 F.3d 748, 749-50 (9th Cir. 1995)); 20 C.F.R. § 404.1529(c). An
18           ALJ's finding that a claimant generally lacked credibility is permissible basis to reject
             excess pain testimony.

19

20   *See also* S.S.R. 96-7p.[3]

21           An ALJ may consider the following factors to determine the credibility of a claimant's

22   allegations of disabling pain:

23           1.      The nature, location, onset, duration, frequency, radiation, and intensity of any pain;

24   _____

25           [3]      Social Security Ruling 96-7p sets out factors to assess a claimant's credibility: (1) claimant's daily
     activities; (2) location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) factors that precipitate
26   and aggravate the symptoms; (4) type, dosage, effectiveness, and side effects of any medication the claimant takes or has
     taken to alleviate pain or other symptoms; (5) treatment, other than medication, the claimant receives or has received for relief
27   of pain or other symptoms; (6) measures other than treatment the individual uses or has used to relieve pain or other
     symptoms (e.g., lying flat on his or her back, standing 15 to 20 minutes every hour, or sleeping on a board); and (7) any other
28   factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

2.    Precipitating and aggravating factors (e.g., movement, activity, environmental conditions);

3.    Type, dosage, effectiveness, and adverse side-effects of any pain medication;

4.    Treatment, other than medication, for relief of pain;

5.    Functional restrictions;

6.    Claimant's daily activities;

7.    Unexplained, or inadequately explained, failure to seek treatment or to follow up a prescribed course of treatment; and

8.    Ordinary techniques to test a claimant's credibility.

*Bunnell*, 947 F.2d at 346; *see* 20 C.F.R. §§ 404.1529, 416.929.

The ALJ thoroughly detailed the medical evidence and plaintiff's claims and testimony to address plaintiff's credibility:

> The claimant's prior reports and testimony are also inconsistent with no more than moderate difficulties in social functioning and with fairly benign activities of daily functioning and mild difficulties with concentration, persistence and pace. Notably, the claimant described rather normal current functioning in her evaluation with Dr. Fields. Specifically, the claimant noted that she lived with her son, that she was unable to drive, but able to take public transportation, that she was able to shop for groceries, prepare meals, and do laundry and housework, and that she was independent in her activities of daily living (Exhibit 15F/2-3). She also reported to Dr. Fields that she will intermittently sleep and clean throughout the day, visits with a couple of friends, and spends time reading the Bible and listening to the radio with very little television viewing (Exhibit 15F/2-3). The claimant also previously reported that she was able to perform most of these tasks in her daily activities questionnaire dated March 21, 2001 (Exhibit 11E). Although he noted that the claimant was often scared, having nightmares and screamed in her sleep, the claimant's son, Mr. Darius Aliyu, confirmed that his mother prepared food daily, shopped for food and clothes, performed such household tasks as washing clothes and dishes, sweeping the kitchen floor and dusting. (AR 19-20.)

The ALJ further addressed plaintiff's complaints:

> The undersigned, however, finds that the claimant's subjective complaints are not entirely credible and are inconsistent with her reported daily activities, extent of objective medical support, and the weight of substantial evidence on record. To this end, the undersigned emphasizes that the claimant has consistently shown fairly normal neurological findings with full motor strength, good grip strength, full range of motion, negative straight leg raising, normal gait, and no signs of atrophy that would support the extent of the claimant's punctuated inactivity. Her progress notes also show only sporadic signs of tenderness with spasm that is more consistent with an occasional strain and exacerbation rather than a constant disabling pain. With respect to her activities of daily living, the claimant both testified and reported that she is able to perform many light household activities, including, cooking, shopping and cleaning (Exhibit 11E).

While the claimant has been consistent with her reports of anxiety around other people, she acknowledged that she does go outside of her home to the doctor's office, to pay bills, to the grocery store, and to her son's school meetings (Exhibit 11E/3). It is evident that the claimant is uneasy around other people, however, her diagnosis of "without agoraphobia" seems to be accurate.  As noted in the "B" criteria analysis above, the claimant's son reports essentially echo the claimant's reports concerning her daily activities (Exhibit 12E).  Such activities are limited, but are substantially consistent with the residual functional capacity described above.  (AR 23.)

Plaintiff points to no meaningful error in the ALJ's evaluation of plaintiff's credibility.  The ALJ provided specific reasons supported by the record and substantial evidence to discredit plaintiff's sweeping claims of limitations.  The detailed medical evidence contradicts plaintiff's claims of severe limitations.  Medical evidence is "a relevant factor in determining the severity of the claimant's pain and its disabling effects." *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001); *see Tidwell v. Apfel*, 161 F.3d 599, 602 (9th Cir. 1998) (the medical evidence suffices as "specific, clear, and convincing reasons" to discredit pain claims); *Roberts v. Shalala*, 66 F.3d 179, 183 (9th Cir. 1995), *cert. denied*, 517 U.S. 1122, 116 S.Ct. 1356 (1996) (claimant has the burden to prove she has a qualified impairment that meets the 12-month duration requirement).  Although plaintiff appeared at the September 10, 2002 hearing with a cane, the medical record lacks reference for such need, and in fact, Dr. Woods noted that "none is medically indicated."  (AR 242.)  Based on the ALJ's specific findings supported by substantial evidence,  this Court is precluded to second guess the ALJ or to conclude that the ALJ arbitrarily discredited plaintiff.

**Residual Functional Capacity**

The ALJ found plaintiff has the residual functional capacity for no more than the full range of unskilled, light exertional work, reduced by environmental limitations that preclude work around dust, smoke, irritants or other noxious fumes.  (AR 25.)  Plaintiff argues that plaintiff's left ventricular hyperthrophy ("LVH"), asthma and obesity support a "worse" residual functional capacity.  As the Commissioner correctly notes, the "mere existence of an impairment is insufficient proof of a disability." *Matthhews v. Shalala*, 10 F.3d 678, 680 (9th Cir. 1993).  "A claimant bears the burden of proving that an impairment is disabling."  *Miller v. Heckler*, 770 F.2d 845, 849 (9th Cir. 1985).  A claimant must prove he/she is precluded to engage in substantial gainful activity for 12 consecutive months. 42 U.S.C. § 423(d)(1)(A); *Matthews*, 10 F.3d at 680.

The medical evidence does not support a more restrictive residual functional capacity. Although an electrocardiogram revealed LVH, Thallium treadmill testing demonstrated good exercise endurance and no exercise induced chest pain. (AR 283.) Thallim imaging showed evidence of neither ischemia nor infarction. (AR 284.) Plaintiff's chest pain was sporadic. (AR 346.) Dr. Kerwin treated plaintiff's chest pain as GERD, not cardiac. (AR 281, 320, 324.) The medical record lacks reference to or evidence of significant or disabling limitations from plaintiff's obesity or asthma. Progress notes reflect plaintiff's asthma was good. (AR 268, 277.) Plaintiff denied shortness of breath, wheezing and cough. (AR 268, 269, 276, 277, 278.) April 25, 2000 chest x-rays were "stable." (AR 310.) October 24, 2000 chest x-ray's revealed no acute disease. (AR 302.) Dr. Kerwin characterized plaintiff's obesity as "mild." (AR 348.)

Plaintiff fails to explain her criticism that the ALJ "wrongly rejected Dr. Kerwin's opinion under the law." A treating physician's opinion is not conclusive as to a claimant's physical condition or the ultimate issue of disability and may be disregarded by the ALJ even when it is not contradicted. *Rodriquez v. Bowen*, 876 F.2d 759, 761-762, n. 7 (9th Cir. 1989); *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989); *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992).[4] An ALJ may reject a treating physician's opinion whether or not it is contradicted, if the opinion is "brief and conclusory in form with little in the way of clinical findings to support its conclusion." *Magallanes,* 881 F.2d at 751. Inconsistencies and ambiguities in a treating physician's opinion regarding disability may constitute specific, legitimate reasons to reject the opinion. *Matney*, 981 F.2d at 1020.

The Ninth Circuit has further explained:

> To reject the opinion of a treating physician which conflicts with that of an examining physician, the ALJ must "'make findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record.'" . . . "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." . . . The rule . . . does not apply, however, "when the nontreating physician relies on independent clinical findings that differ from the findings of the treating physician." . . . "'[T]o the extent that [the nontreating physician's] opinion rests on objective clinical tests, it must be viewed as substantial evidence . . .'"

---

[4]   A treating physician's opinion is not conclusive as to claimant's disability as this ultimate issue is an administrative finding reserved to the Commissioner. 20 C.F.R. § 404.1527(e). The Commissioner has final responsibility to determine a claimant's residual functional capacity. 20 C.F.R. § 404.1546.

1  *Magallanes*, 881 F.2d at 751(citations omitted.)

2      An ALJ may reject a treating physician's report based on a claimant's exaggerated claims. *See,*

3  *e.g., Sandgathe*, 108 F.3d at 980.  A physician's opinion of disability "premised to a large extent upon

4  claimant's own accounts of his symptoms and limitations" may be disregarded where those complaints

5  have been "properly discounted." *Fair*, 885 F.2d at 605 (citing *Brawner v. Sec. of Health & Human*

6  *Servs.*, 839 F.2d 432, 433-434 (9th Cir. 1988)); *see Saelee*, 94 F.3d at 522 ("no physician has been able

7  to find a link between [claimant's] complaints and known medical pathologies").

8      "[T]he ALJ is responsible for determining credibility, resolving conflicts in the medical

9  testimony, and for resolving ambiguities." *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998).

10  Inconsistencies and ambiguities in a treating physician's opinion regarding disability may constitute

11  specific, legitimate reasons to reject the opinion. *Matney*, 981 F.2d at 1020.

12      The ALJ provide specific, legitimate reasons to reject Dr. Kerwin's inconsistent assessment:

13      In this regard, the undersigned points out several inconsistencies between Dr. Kerwin's
        own medical assessments dated November 3, 2000, January 17, 2002 and July 9, 2002
14      and the substantial evidence of record. On November 3, 2000, Dr. Kerwin stated that the
        claimant had difficulty sitting, standing and bending.  He also stated that the claimant
15      was unable to lift more than five pounds occasionally.  Dr. Kerwin also specifically
        found that the claimant was not capable of performing even a full range of sedentary
16      work, and would be hard pressed to understand, remember and carry out even simple
        instructions (Exhibit 17F/34).  A review of his November 2000 findings indicates that
17      his opinion is based primarily on the claimant's own subjective reports rather than from
        any positive objective evidence (Exhibit 17F/34-35).  On January 12, 2002, Dr. Kerwin
18      stated that the claimant could lift up to 20 pounds occasionally, sit for four hours in an
        eight hour day, stand two hours in an eight hour day, and walk for two hours in an eight
19      hour day.  He also found that the claimant would never be able to perform any climbing,
        stooping, crouching, kneeling, or crawling (Exhibit 11F).  Dr. Kerwin's opinion on July
20      9, 2002 included limitations for sitting, standing and walking of no more than two hours
        in an eight hour day and lifting/carrying of no more than ten pounds occasionally
21      (Exhibit 18F).

22      . . .Nevertheless, in addition to providing differing opinions concerning the claimant's
        functional abilities to lift, stand, and walk in his medical assessments noted above, the
23      severity of Dr. Kerwin's opinion concerning the extent of the claimant's functional
        limitations are not reflective of the objective findings found in his progress notes. Given
24      at time that his assessments . . . have found the claimant's condition to be nearly bed
        bound, the record is conspicuously absent any objective findings of substantial atrophy
25      or neurological deficit. Dr. Kerwin also gives few clinical objective findings in support
        of his conclusions, and even when given, the findings are vague such as tenderness and
26      some spasm (Exhibit 11F).  The undersigned thus finds that Dr. Kerwin's specific
        opinions concerning the claimant's functional abilities are out of proportion to his own
27      findings upon examination and not supported by the substantial evidence of record. Dr.
        Kerwin's conflicting opinions are accordingly given very little weight (SSR 96-6p). (AR
28      21-22.)

1    This Court finds no error in the ALJ's evaluation of Dr. Kerwin's assessment and in turn the

2    ALJ's rejection of it to evaluate plaintiff's residual functional capacity.  Moreover, plaintiff fails to

3    demonstrate the ALJ's improper reliance on Dr. Wood's opinion, which is supported with his normal

4    objective findings.  (AR 22.)

5                                    **CONCLUSION AND ORDER**

6    For the reasons discussed above, this Court finds no error in the ALJ's analysis and that the ALJ

7    properly concluded plaintiff is not disabled.  This Court further finds the ALJ's decision is supported

8    by substantial evidence in the record as a whole and based on proper legal standards. Accordingly, this

9    Court DENIES plaintiff's request to reverse the Commissioner's decision to deny plaintiff disability

10   insurance benefits and SSI or to remand for further proceedings.  This Court DIRECTS the Court's clerk

11   to enter judgment in favor of defendant Jo Anne B. Barnhart, Commissioner of Social Security, and

12   against plaintiff Glorita Aliyu and to close this action.

13   IT IS SO ORDERED.

14   **Dated:    October 19, 2005           /s/ Lawrence J. O'Neill**
     66h44d                          UNITED STATES MAGISTRATE JUDGE

15

16

17

18

19

20

21

22

23

24

25

26

27

28